UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:_ 12/02/2013_____

KADIE SESAY-HARRELL,

                Plaintiff,

         v.

NYC DEPARTMENT OF HOMELESS
SERVICES,

                Defendant.

--------------------------------------------------------X

12 Civ. 925 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

On February 1, 2012, Plaintiff Kadie Sesay-Harrell, proceeding *pro se*, filed this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"); the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12112 to 12117 (the "ADA"); the New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 297 (the "NYSHRL"); and the New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 to 8-131 (the "NYCHRL") against Defendant NYC Department of Homeless Services. In broad summary, Plaintiff alleges retaliation and employment discrimination based on her sex, national origin, and disability. Defendant has moved for summary judgment on all of Plaintiff's claims. For the reasons set forth in the remainder of this Opinion, Defendant's motion is granted as to all claims except for Plaintiff's hostile work environment claims under Title VII, the NYSHRL, and the NYCHRL.

# FACTUAL BACKGROUND[1]

Throughout this case, Plaintiff has alleged a host of actions by Defendant's employees that Plaintiff maintains are discriminatory.  However, neither Plaintiff's form complaint nor her opposition brief to the instant motion provides clarity regarding the specific theory or theories of liability that Plaintiff pursues.  Consequently, the Court has read Plaintiff's pleadings broadly, *see*

---

[1]    Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York (the "Local Rules") requires a party moving for summary judgment to submit a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  Local Rule 56.1(a).  The movant's asserted facts are deemed to be admitted unless specifically controverted by the statement served by the opposing party.  Local Rule 56.1(c).  *Pro se* litigants are "not excused from meeting the requirements of Local Rule 56.1."  *Wali* v. *One Source Co.*, 678 F. Supp. 2d 170, 178 (S.D.N.Y. 2009).

Defendant filed a Rule 56.1 Statement on May 24, 2013 ("Defendant's 56.1 Statement" or "Def. 56.1").  (Dkt. #30).  Plaintiff's Memorandum of Law in Opposition to Defendant's motion for summary judgment ("Plaintiff's Opposition" or "Pl. Opp.") (Dkt. #34) is, in all practicality, a statement pursuant to Rule 56.1 and a counterstatement to Defendant's 56.1 Statement.  Despite Plaintiff's incomplete compliance with the Local Rules, the Court retains discretion "to consider the substance of the plaintiff's arguments."  *Wali,* 678 F. Supp. 2d at 178 (citing *Holtz* v. *Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[W]hile a court is not required to consider what the parties fail to point out in their Local Rule 56.1 Statements, it may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement." (internal quotation marks omitted))); *see also Hayes* v. *Cnty. of Sullivan*, 853 F. Supp. 2d 400, 406 n.1 (S.D.N.Y. 2012) ("In light of Plaintiff's *pro se* status, the Court overlooks his failure to file a Local Rule 56.1 Statement and conducts its own independent review of the record.").

The facts in this Opinion are drawn from Defendant's Rule 56.1 Statement, certain of the exhibits thereto, Plaintiff's Opposition, and Plaintiff's February 28, 2013 deposition ("Pl. Dep.") (Dkt. #32-1), the transcript of which is included as Exhibit B to Defendant's Rule 56.1 Statement.  For convenience, Defendant's Memorandum of Law in Support of Motion for Summary Judgment is referred to in this Opinion as "Def. Br." and Defendant's Reply Memorandum of Law in Further Support of Defendant's Motion for Summary Judgment is referred to as "Def. Reply."

*Cruz* v. *Gomez*, 202 F.3d 593, 597 (2d Cir. 2000) ("[C]ourts must construe *pro se* pleadings broadly, and interpret them 'to raise the strongest arguments that they suggest.'" (quoting *Graham* v. *Henderson*, 89 F.3d 75, 79 (2d Cir. 1996))), and has construed Plaintiff's allegations in the light most favorable to her.

**A.    Plaintiff's Employment with Defendant**

Plaintiff has been employed by the City of New York (the "City"), in its Department of Homeless Services ("DHS"), since February 1998.  (Pl. Dep. 8:10-11).  Plaintiff is currently employed as a Fraud Investigator Level 2, a position commonly referred to as Family Worker.  (Def. 56.1 ¶ 3 and Exh. E).  In this position, Plaintiff interviews individuals for temporary housing and makes recommendations as to same.  (Pl. Dep. 6:20-7:4).

As of September 30, 2002, Plaintiff was provisionally appointed to a higher position, that of Associate Fraud Investigator.  (Provisional Appointment Statement, Pl. Br. 8).  In or about 2008, Plaintiff took a written examination for permanent appointment to this position.  (Def. 56.1 ¶ 7).  Unfortunately for Plaintiff, however, she received a score of 73.775 on the exam, which placed Plaintiff at number 154 out of 167 candidates on the rank order list for permanent appointment.  (Def. 56.1, Exh. D).

By letter dated February 9, 2009, Plaintiff was informed that DHS had been given the rank order list to replace individuals, like Plaintiff, who were serving provisionally.  (Def. 56.1, Exh. E).  The letter indicated that because Plaintiff was not included on the list, or because Plaintiff's list number was not

3

high enough to be reached for permanent appointment, she would revert back to her permanent title of Fraud Investigator, effective February 23, 2009.  (*Id.*).

**B.      The Alleged Discriminatory Conduct**

It is no overstatement to say that Plaintiff raises literally dozens of allegations of discrimination against her supervisors at DHS from 2007 through the present.  As noted, Plaintiff alleges that she was discriminated against because of her Sierra Leone national origin; based on her female gender (in the form of a hostile work environment); and due to her disabilities.  (Pl. Dep. 10:10-24, 65:24-66:2).  These claims, and the record evidence offered in their support, are set forth in the remainder of this section.

**1.      Discrimination Based on Plaintiff's Disability**

Plaintiff alleges a disability relating to "stomach problems" and a "back injury" that has rendered her unable to work, and for which she is currently collecting disability payments in the amount of $1,502 every two weeks.  (Pl. Dep. 10:25-11-6, 13:10-11).  Plaintiff has not alleged a specific diagnosis, but rather testified at her deposition that she (i) "has several diagnoses"; (ii) has "intestinal problems and [] cannot digest certain foods and [is] constantly in pain"; and (iii) has "an upper and lower back injury."  (*Id.* at 11:17-13:23). Plaintiff further testified that her stomach and back-related impairments prevent her from performing her current employment duties.  (*Id.* at 14:9-14). As a result, Plaintiff has been out on disability leave since February 24, 2012, shortly after she filed the instant lawsuit.  (*Id.* at 11:9-14).

4

Plaintiff alleges that she was subjected to discrimination from supervisors Ronny Sandoval and Michelle Pegram based on her disability. However, several of her proffered claims of discrimination are curious, if not entirely specious.  Specifically, Plaintiff finds discrimination in the facts that she was: (i) required to submit a doctor's note when she took leave to attend a doctor's appointment; (ii) offered Family and Medical Leave Act ("FMLA") leave by Defendant; (iii) written up in 2009 by Pegram; (iv) spoken to in a "demeaning fashion" by her supervisors when she needed to take leave; and (v) told by her supervisors that she should take time off if her disability prevented her from working.  (Pl. Dep. 17:6-18:25, 21:3-19).

To support her claims of discrimination based on disability, Plaintiff testified that her supervisors spoke to her in a demeaning fashion in or around April or May 2009 (*id.* at 19:18-19), and that she was offered FMLA leave in October or November 2012 (*id.* at 22:1-3).  Plaintiff has offered no further details, not even approximate dates, for the other discriminatory conduct alleged above.

## 2.     Discrimination Based on Plaintiff's National Origin

Separate and apart from her disability claims, Plaintiff alleges that she was discriminated against because of her Sierra Leone national origin by three supervisors, Njideka Kelley, Michelle Pegram, and Ambrose Okojie.  (Pl. Dep. 14:15-15:19, 69:5-16).  Plaintiff also alleges, with no mention of any particular

supervisor, that she was discriminated against based on her national origin by constantly being transferred to different supervisors.  (*Id.* at 52:14-16).

### a.    Alleged Discrimination by Njideka Kelley

Plaintiff testified at her deposition that Njideka Kelley made discriminatory statements concerning Plaintiff's national origin, including statements in 2007 that people from Sierra Leone are "from a small country," that it is a "poor country," and that Plaintiff is "very assertive … [f]or somebody that came from a small country."  (Pl. Dep. 67:6-20).

Plaintiff has also alleged various discriminatory acts by Kelley.  First, Plaintiff complains about Kelley's 2007 evaluation of Plaintiff, which Plaintiff claims was "horrible," in that it "totally just discredited me on my work ethic," and stated falsely that Plaintiff had a "horrible time and leave" record.  (Pl. Dep. 27:1-23).  Notably, the actual evaluation gave Plaintiff an overall rating of "good."  (Def. 56.1, Exh. F).  Nonetheless, Plaintiff wrote on this evaluation:

> I am signing this performance evaluation but still totall[y] disagreeing with justification rating I and II follow by overall rating. Therefore, I am requesting a throug[h] investigation and review of my evaluation report, which at this time I feel is rated with intent based on bias, prejudicial and personal opinion.

(*Id.*).

Also in 2007, according to Plaintiff, Kelley engaged in discriminatory conduct by submitting an insubordination letter to Plaintiff's file.  (Pl. Dep. 22:24-25:22; Def. 56.1, Exh. G).  The letter recounted conversations that Kelley had had with Plaintiff regarding Plaintiff leaving work to attend a co-worker's

funeral, which Plaintiff claimed another supervisor permitted her to attend. (*Id.*).  Kelley's letter recounted that Plaintiff had spoken to Kelley in a rude, "condescending tone" during those conversations, and that Plaintiff had not responded to certain of Kelley's inquiries.  (Def. 56.1, Exh. G).  After describing the incident, Kelley wrote: "I am writing this memo to inform you that your manner of conduct is disrespectful and condescending to me as your supervisor.  You are being warned to refrain from this type of conduct in the future as similar conduct on your part may result in further action against you."  (Def. 56.1, Exh. G).[2]  Significantly, however, and as Plaintiff has acknowledged, no further action was taken by Defendant as a result of this letter.  (Pl. Dep. 26:5-8).[3]

Finally, Plaintiff alleges that Kelley discriminated against her by making disparaging statements concerning Plaintiff's "work ethic" and knowledge of relevant work policies to Plaintiff's other supervisors, including Ronny Sandoval and Lenox George.  (Pl. Dep. 30:18-31:9).  To be clear, Plaintiff provides no details concerning the time, place, or content of the alleged disparaging comments.  Nonetheless, Plaintiff surmises that because of what

---

[2]     The letter indicates that Kelley and an unidentified witness signed it, but that Plaintiff refused to sign it.  (Def. 56.1, Exh.G).

[3]     Plaintiff further alleges that the day after Kelley issued the insubordination letter, Plaintiff was issued another disciplinary letter for purportedly leaving a client unattended.  (Pl. Dep. 28:6-20).  Here, too, no further disciplinary action was taken by Defendant.  (*Id.* at 29:15-30:3).  Plaintiff speculated at her deposition that her demotion could have been based, in part, on the letter, but conceded that she did not know.  (*Id.* at 29:20-25).

Kelley told Plaintiff's supervisors, she received a lower salary than other employees with the Family Worker title.  (*Id.* at 31:10-32:3).[4]  Plaintiff acknowledges that her salary was set by union contract, not by her supervisors; that she had been advised by a union representative that employees in her class received different salaries; and that her union had specifically declined to file a grievance on Plaintiff's behalf.  (*Id.* at 32:4-25).

### b.  Alleged Discrimination by Michelle Pegram

Plaintiff also advances a number of claims of discriminatory conduct by Michelle Pegram, none of which appears specifically to target Plaintiff's national origin (or, indeed, any protected status).  The cited conduct includes the following:

(i)   Pegram submitted the 2009 disciplinary letter discussed above, on which Plaintiff's disability discrimination charge is also predicated.  (Pl. Dep. 33:11-34:9).[5]

(ii)  In 2010, Pegram requested, via an e-mail on which Plaintiff was mistakenly copied, that one of Plaintiff's supervisors add to a disciplinary letter that Pegram had written about Plaintiff.  (*Id.* at 44:12-45:11).  Plaintiff alleges that the very act of copying Plaintiff on said e-mail was discriminatory.  (*Id.* at 45:20-22).

(iii) In 2010, Pegram had Plaintiff's personal belongings and work files placed in the office basement.  (*Id.* at 53:16-54:3).

(iv)  In 2012, Pegram instructed Plaintiff to inform Plaintiff's supervisor when she left her desk, after an incident in which

---

[4]   Plaintiff stated that she received $47,000 in salary, while her co-workers with the same title received $54,000.  (Pl. Dep. 32:1-3).

[5]   Plaintiff spoke with attorneys for the City about the disciplinary letters she received, who informed Plaintiff that there was "nothing wrong" with the letters in her file.  (Pl. Dep. 33:18-25).

Plaintiff's supervisors were unable to locate her.  *(Id.* at 34:12-
36:10).

(v)     That same year, Pegram declined to approve of Plaintiff being
        paid for a work day during which she was absent, ostensibly to
        determine why she was not receiving timely paychecks for the
        period October 2011 through January 6, 2012.  *(Id.* at 36:13-
        38:6).  Plaintiff maintains that she was granted permission to be
        absent from work with pay from another supervisor during that
        time.  *(Id.* at 38:3-6).

(vi)    Also in 2012, Pegram took away one of Plaintiff's cases.  *(Id.* at
        43:15-44:1).  Plaintiff acknowledged, however, that she did not
        lose any pay or benefits as a result.  *(Id.* at 43:21-23).

(vii)   In late 2012, Pegram denied Plaintiff's request to have a union
        representative present during a non-disciplinary meeting with
        her supervisors that was convened at Plaintiff's request.  *(Id.* at
        39:8-41:24).

(viii)  In 2009 and 2010, Pegram did not address Plaintiff's
        complaints about Plaintiff's supervisors.  *(Id.* at 44:2-14, 46:2-
        23).

(ix)    Pegram and other supervisors wrote up Plaintiff with respect to
        Plaintiff not completing her work properly.  *(Id.* at 47:19-
        50:20).[6]

(x)     Pegram called Plaintiff "crazy" and stated that Plaintiff had
        "mental issues" in one of Plaintiff's disciplinary letters.  *(Id.* at
        46:24-47:4).

### c.     Alleged Discrimination by Ambrose Okojie

Ambrose Okojie was Plaintiff's supervisor for a few months in late 2009.

(Def. 56.1, Exh. Q).[7]  During that time, Okojie supposedly told Plaintiff that he

---

[6]     Plaintiff testified that she was written up shortly after she left work to attend a doctor's
        appointment without her supervisors' approval, but that the write-up did not reference
        her leaving work without approval.  (Pl. Dep. 48:23-50:25).  This testimony, however,
        conflicted with other testimony by Plaintiff that the write-up was "based on the fact that
        I left that day after work" to attend a doctor's appointment.  *(Id.* at 48:23-25).  In any
        event, no further action was taken by Defendant against Plaintiff on account of this
        letter.  *(Id.* at 51:4-16).

was "going to put [Plaintiff] in [her] place," which Plaintiff perceived to be a slight based on her national origin.  (*Id.* at 69:5-16).  According to Plaintiff, Okojie stated that people from Sierra Leone were "vicious," "mean," "evil" people who "cut people's arms and legs off when they are upset."  (*Id.* at 69:5-70:10). Okojie also was alleged to have said that Plaintiff was from a "poor country." (*Id.* at 70:11-15).

### 3.    Hostile Work Environment

Plaintiff's principal claims against Okojie, however, are that he discriminated against her based on her gender — both before and while serving as her supervisor — by creating a hostile work environment.  (Pl. Dep. 15:21-16:14).[8]  According to Plaintiff, the discriminatory conduct began in 2007, when Okojie asked Plaintiff during a telephone call "what color pants" she had on.  (Pl. Dep. 72:16-23).  That same year, another incident occurred with Okojie and Osa Egafona, another employee, during which Okojie supposedly

---

[7]    Plaintiff maintains that Okojie has been her "indirect" supervisor since February 23, 2009.  (Pl. Br. 3).

[8]    In seeking to controvert Plaintiff's allegations regarding Okojie's conduct, Defendant provided a letter from Okojie dated February 10, 2010, in which Okojie summarily denies Plaintiff's allegations.  (*See* Def. 56.1, Exh. L).  Whether Plaintiff's sworn averments should be credited over Okojie's account is a question better left to the jury, and one not suitable for determination on summary judgment.  *Rule* v. *Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."); *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553-54 (2d Cir. 2005) ("[D]istrict courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage").

told Egafona, "You are f'ing this one and you are f'ing that one.  Why don't you leave [Plaintiff] for me?"  (*Id.* at 71:14-25, 72:7-9).

Plaintiff does not allege any discriminatory conduct by Okojie between 2007 and 2009.  However, she alleges that in or around November and December 2009,[9] while directly supervising Plaintiff, Okojie would "hold his private part and tell [Plaintiff] that [he] want[ed] to f— [her]."  (Pl. Dep. 56:4-16; *see also id.* at 60:9 (claiming that Okojie made "a lot of passes" at her)).  Plaintiff also alleges that each time she would hand in a case to Okojie, he would state: "[Your] eyes are beautiful.  It makes me want to f— you."  (*Id.* at 10:11-15).

Plaintiff maintains that Okojie was "constantly sexually harassing" her.  (Pl. Dep. 56:16-17).  When Okojie engaged in this conduct, Plaintiff would leave his office and would tell Okojie that he "need[ed] to stop."  (*Id.* at 56:21-24, 60:16-17).[10]

During this same time, Okojie is alleged to have approached Plaintiff in the hallway of their building and warned her that: "If you lose your support system.  If you lose your children, you know, then you ... can succumb to my

---

[9]   Plaintiff testified that Okojie's conduct occurred in November/December 2010, but stated in a Charge of Discrimination that she filed with the United States Equal Employment Opportunity Commission on April 7, 2010 (the "EEOC Charge") that the conduct took place in November/December 2009.  (Def. 56.1, Exh. Q).  Documents provided by Defendant indicate that Okojie's alleged conduct occurred, if at all, in late 2009. (Def. 56.1, Exh. L, M).

[10]   Plaintiff claims to have told two of her co-workers, who were not her supervisors, about this incident with Okojie.  (Pl. Dep. 60:18-62:3).  Plaintiff requested that one co-worker speak with Okojie about his conduct.  (*Id.* at 62:13-18).

needs." (Pl. Dep. 62:21-63:3; *see also id.* at 63:7-8 (similar comment regarding loss of boyfriend)). After this incident in the hallway occurred, Okojie informed Plaintiff that the "Legal Department sa[id] that [Plaintiff was] not doing [her] work." (*Id.* at 63:11-13).

According to Plaintiff, Okojie once slapped her behind while she was walking in the hallway after handing him an assignment. (Pl. Dep. 63:21-22). When this occurred, Plaintiff became "furious," approached Okojie, and told him that he had "really crossed the line." (*Id.* at 63:24-64:3). A cleaning crew employee, who witnessed this interaction, stated to Plaintiff that she did not have to take this conduct from Okojie. (*Id.* at 64:4-6). Plaintiff, "embarrassed" about what had occurred, walked away. After this incident, Plaintiff vowed "not [to] take [Okojie's conduct] anymore." (*Id.* at 63:14).

At her deposition, Plaintiff recounted that after this incident occurred, she told her immediate supervisor what happened, who advised Plaintiff that they would "sit down and talk about it." Plaintiff, dissatisfied with this supervisor's progress, asked to take the matter to Rebecca Chu, Plaintiff's director at the time. (Pl. Dep. 64:7-22 (feeling that her supervisors "wanted to squash it, again. No one came forward to do anything.")). Plaintiff then had a meeting with Chu during which she explained the situation with Okojie; after the meeting, Chu sent Plaintiff's complaint to DHS' Office of Equal Opportunity Affairs ("EOA"). (*Id.* at 64:19-22). Shortly thereafter, Plaintiff was transferred

to a different unit, and there were no further allegations of sexual harassment. (*Id.* at 64:25-65:4).[11]

By letter dated September 17, 2010, EOA notified Plaintiff that it had completed its investigation regarding Okojie, and concluded that because it was "unable to substantive [Plaintiff's] allegations[,]" the case would be "administratively closed." (Def. 56.1, Exh. M). Throughout this time, Plaintiff's title and position remained the same. (Pl. Dep. 65:20-23).

### 4. Retaliatory Conduct

Plaintiff advances numerous claims of what she terms "retaliation" by Njideka Kelley, Ronny Sandoval, Michelle Pegram, Ambrose Okojie, and Donaldson Barclay. (Def. 56.1 ¶ 21, Exh. Q; Pl. Dep. 73:1-25). In addition, Plaintiff reiterates many of the allegations of discriminatory conduct discussed above and recasts them as further evidence of her retaliation claim.

Plaintiff is noticeably unclear, however, as to the protected conduct in which she engaged that prompted the alleged retaliation. The Court will assume, as to those incidents that post-date April 2010, that Plaintiff is claiming retaliation for her decision that month to file a charge with the Equal Employment Opportunity Commission, which charge is discussed in the next

---

[11]    Plaintiff states in her motion papers that "Okojie made several sexual remarks and grabbed [her] breast and buttocks in front of other co-workers," but failed to provide any record support for these allegations. (Pl. Br. 3). Plaintiff also asserts that the "hostile working condition remains the same," even though Plaintiff has been on disability leave for more than 20 months. (*Id.*).

section.  As to the other incidents, the Court is unable to discern the genesis of the retaliatory conduct.

With specific respect to Kelley, Plaintiff asserts retaliation in the form of informing Plaintiff's supervisor, in December 2011, that Plaintiff was on the fifth floor of DHS's building.  (Pl. Dep. 75:1-76:21).  Plaintiff does not allege, however, how this information was detrimental to her or, more broadly, that anything happened to her as a result.

Plaintiff's contentions about retaliatory treatment by Sandoval are much more extensive, and include the following:

(i)   Sandoval wrote Plaintiff up on March 25, 2009, for failing to clock in and out on March 24 and 25, 2009, and for failing to inform Sandoval that she returned from leave.  (Pl. Dep. 77:10-79:10).[12]

(ii)  In 2011, Sandoval changed Plaintiff's password to her e-mail account, and required Plaintiff to obtain a new account password from Sandoval pursuant to company policy.  (*Id.* at 79:11-81:22).

(iii) After Plaintiff's password was changed, Sandoval allegedly deleted Plaintiff's e-mails.  (*Id.* at 81:23-82:4).  Plaintiff did not see Sandoval delete the e-mails, however, and could offer no proof of their deletion by anyone.  (*Id.* at 82:5-6).  When Plaintiff inquired of Sandoval what had happened, Sandoval stated that she would look into the matter with the necessary department, but never did.  (*Id.* at 82:3-14).

(iv)  Sandoval put "post-it" notes on Plaintiff's desk.  (*Id.* at 83:18-20).

---

[12]   The Conference Memo memorializing Plaintiff's insubordination stated that Plaintiff had "failed to report" to Sandoval or any other supervisor when she returned to work "after being absent for 3 weeks," and that Plaintiff had failed to clock in and out as required. Plaintiff was informed that "similar conduct on [her] part may necessitate formal disciplinary action against [her]."  (Def. 56.1, Exh. N).

14

   (v)     Between October and November 2011, Sandoval told Plaintiff to take lunch at a designated time.  (*Id.* at 84:10-85:20).

   (vi)    Sandoval instructed Plaintiff to inform Sandoval when she (Plaintiff) was leaving her desk.  (*Id.* at 85:21-86:9).

   (vii)   In or around 2009 and 2011, Sandoval "holler[ed]" at Plaintiff in the office, told Plaintiff she was acting like a child and did not know her work, and asked Plaintiff if she was going home.  (*Id.* at 86:10-87:21, 88:25-89:10).

   (viii)  Sandoval wrote up Plaintiff for leaving work to get her paycheck in October or November 2011.  (*Id.* at 88:16-24).

Plaintiff's retaliation claims against Pegram are nearly as numerous, and include the following:

   (i)      Pegram did not address Plaintiff's complaints against Sandoval in April 2009 and November 2011.  (Pl. Dep. 90:2-11).

   (ii)     Pegram instructed Sandoval to write up Plaintiff for abandoning her post in January 2012.  (*Id.* at 90:19-25).

   (iii)    In or around the end of 2011, Pegram removed Plaintiff's coat that was hanging on Plaintiff's cubicle door to Plaintiff's desk or chair.  (*Id.* at 92:10-94:5).[13]

   (iv)    In 2010, Pegram requested, via an e-mail on which Plaintiff was copied, that one of Plaintiff's supervisors add to a disciplinary letter that Pegram had written about Plaintiff. (*Id.* at 94:11-17).

   (v)      Pegram offered Plaintiff FMLA leave for her disabilities in 2012.  (*Id.* at 94:24-95:23).

With respect to Okojie, Plaintiff testified that he retaliated against her for filing her EEOC Charge and the instant lawsuit by telling her supervisors that Plaintiff did not know what she was doing.  (Pl. Dep. 96:5-97:24).  Plaintiff also

---

[13]    Plaintiff's deposition testimony on this incident is unclear.  First, Plaintiff stated that Pegram moved her coat from her cubicle door to her chair (Pl. Dep. 93:17-18); later, she stated that Pegram "threw" Plaintiff's coat on top of Plaintiff's desk (*id.* at 20-22).

noted that Okojie attended a meeting at which Sandoval (but not Okojie) stated that Plaintiff did not know what she was doing. (*Id.* at 97:11-24).

Finally, as to Barclay, Plaintiff avers that he retaliated against her by requiring Plaintiff to call her supervisors "every fifteen minutes" to advise where she was going in the building (Pl. Dep. 100:13-24),[14] and by not addressing Plaintiff's complaints about Sandoval in October or November 2012 (*id.* at 101:2-13). Plaintiff also testified that Barclay submitted Plaintiff's "time and leave" information in such a manner that Plaintiff's pay was delayed for three pay periods. (*Id.* at 100:6-9). Plaintiff confirmed, however, that she had received any pay that had been delayed. (*Id.* at 100:10-12).

### 5.   Plaintiff's Equal Employment Opportunity Commission Complaint

As noted, Plaintiff filed the EEOC Charge on April 7, 2010. (Def. 56.1, Exh. Q). The EEOC Charge alleged discrimination by Defendant based on Plaintiff's "sex, sexual harassment, national origin, and in retaliation for [her] opposing discrimination actions." (*Id.*). Where instructed to check the appropriate box or boxes identifying the type of discrimination alleged, Plaintiff selected "sex," "retaliation," and "national origin." (*Id.*). Plaintiff did not select "disability," "other," or any other box provided.

---

[14]   Plaintiff's testimony is unclear as to whether Barkley's directive was to Plaintiff specifically, or, rather, an agency-wide protocol. (Pl. Dep. 100:18-24). Plaintiff's testimony is also unclear as to whether she alleges additional retaliation by Barclay in relation to his presence at a meeting in October or November 2012. (*Id.* at 102:3-8).

In Attachment A to her EEOC Charge, Plaintiff alleged that: (i) Ambrose Okojie had sexually harassed Plaintiff in or about September and November 2009; (ii) Plaintiff had been discriminated against by Okojie, as well as other employees of Defendant, based on her Sierra Leone national origin; and (iii) Plaintiff had been retaliated against after she was transferred to a different unit on March 2, 2010, due to Okojie's alleged sexual harassment.  (Def. 56.1, Exh. Q).  Notably, Plaintiff does not allege in her EEOC Charge that she was discriminated against based on her disability, or that her demotion reflected a discriminatory motive.  (*See id.*).  Plaintiff was issued a Right to Sue Letter on November 2, 2011.  (Dkt. #2 at 5).

## C.    The Instant Litigation

Plaintiff commenced this action on February 1, 2012, by filing a form complaint (the "Complaint") alleging employment discrimination pursuant to Title VII, ADA, the NYSHRL, and the NYCHRL against Defendant.  (Dkt. #2).  The Complaint alleged retaliation and employment discrimination based on Plaintiff's sex, national origin, and disability.  In particular, the Complaint asserted that the discriminatory conduct occurred from 2007 to the time Plaintiff filed the Complaint, and included Defendant's failure to promote Plaintiff, Defendant's failure to accommodate Plaintiff's disability, unequal terms and conditions of Plaintiff's employment, retaliation, and other unspecified acts.  (*Id.*).  In contrast to Plaintiff's EEOC Charge, the Complaint

17

included allegations that Defendant's discriminatory conduct extended to its failures to promote Plaintiff and to accommodate Plaintiff's disability.

At the same time Plaintiff filed her Complaint, Plaintiff filed a Request to Proceed *In Forma Pauperis* (Dkt. #1), which request was granted on February 27, 2012 (Dkt. #4).  On June 5, 2012, the Court dismissed this action for failure to prosecute because Plaintiff had failed to timely serve Defendant and to appear for an initial pretrial conference.  (Dkt. #9).  Thereafter, Plaintiff filed a motion for reconsideration requesting that the case be reopened on the basis that Defendant was timely served, and that Plaintiff was unaware of the initial pretrial conference because she did not receive notice of same.  (Dkt. #12).  By Order dated August 10, 2012, the Court granted Plaintiff's motion, and reopened the case.  (Dkt. #13).

Defendant filed the instant motion for summary judgment on May 24, 2013.  (Dkt. #28).  On July 1, 2013, Plaintiff filed a Memorandum of Law in Opposition (Dkt. #34), and on July 26, 2013, Defendant filed its Reply Memorandum of Law (Dkt. #37).  By letter dated Aug 1, 2013, Plaintiff requested leave to file a surreply, which this Court granted.  (Dkt. #40).  On August 27, 2013, Plaintiff filed her surreply (Dkt. #41), and the instant motion was fully submitted.

## DISCUSSION

**A.    Standard of Review**

**1.    Summary Judgment Generally**

Under Federal Rule of Civil Procedure 56(c), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys*, 426 F.3d at 553 (citing *Anderson*).  The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings.  *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (internal quotation marks omitted), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles* v. *General Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985).

The Second Circuit "has repeatedly emphasized the need for caution about granting summary judgment to an employer in a discrimination case where … the merits turn on a dispute as to the employer's intent."  *Gorzynski* v. *JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010).  "Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination."  *Schwapp* v. *Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citations and internal quotation marks omitted); *Holcomb* v. *Iona College*, 521 F.3d 130, 137 (2d Cir. 2008) ("Where an employer has acted with discriminatory intent, direct evidence of that intent will only

20

rarely be available, so that affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination."). "Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment, and show more than 'some metaphysical doubt as to the material facts." *Gorzynski*, 596 F.3d at 101 (citing *Matsushita*, 475 U.S. at 586 (internal citation omitted)).

### 2.   Summary Judgment in *Pro Se* Cases

When considering a motion for summary judgment, the Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson* v. *Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010) (citing *LaSalle Bank Nat'l Ass'n* v. *Nomura Asset Capital Corp.*, 424 F.3d 195, 205 (2d Cir. 2005)). In a case where a party is proceeding *pro se*, the Court must go one step further and liberally construe the party's pleadings "to raise the strongest arguments that they suggest." *McPherson* v. *Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos* v. *Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). Nonetheless, a *pro se* litigant must still be held to the normal requirements of summary judgment, and "bald assertion[s]," unsupported by evidence, will not overcome a motion for summary judgment. *See Carey* v. *Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991); *Stinson* v. *Sheriff's Dep't of Sullivan Cnty.*, 499 F. Supp. 259, 262 (S.D.N.Y. 1980) (holding that the liberal standard accorded to *pro se* pleadings

"is not without limits, and all normal rules of pleading are not absolutely suspended"). "[L]itigants should be on notice from the very publication of Rule 56(e) that a party faced with a summary judgment motion may not rest upon the mere allegations or denials of the party's pleading and that if the party does not respond properly, summary judgment, if appropriate, shall be entered against him." *Champion* v. *Artuz*, 76 F.3d 483, 485 (2d Cir. 1996) (quoting *Graham* v. *Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988)).

**B.    Analysis**

**1.    Plaintiff's Title VII Disability and Demotion Claims Are Procedurally Barred For Failure to Exhaust Administrative Remedies**

Defendant's summary judgment motion begins with several procedural challenges.  First, Defendant argues that Plaintiff's claims under Title VII and the ADA for discrimination based on disability and alleged demotion must be dismissed because Plaintiff failed to exhaust her administrative remedies by not filing these claims with the EEOC.  (Def. Br. 2-3).  Defendant is correct that before filing a Title VII or ADA claim in federal court, a plaintiff must exhaust all available administrative remedies and file a charge of discrimination with the EEOC within 300 days of the alleged discriminatory conduct.  *Hoffman* v. *Williamsville Sch. Dist.*, 443 F. App'x 647, 649 (2d Cir. 2011) ("As with Title VII, plaintiffs asserting ADA claims must exhaust all available administrative remedies, and must file an EEOC charge within 300 days of the alleged

discriminatory conduct if they have instituted proceedings with a state or local agency.") (summary order).

"A district court may only hear claims that are either included in the EEOC charge or are based on conduct which is reasonably related to conduct alleged in the EEOC charge." *Fiscina* v. *New York City Dist. Council of Carpenters*, 401 F. Supp. 2d 345, 356 (S.D.N.Y. 2005). The Second Circuit instructs that "'a claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made.'" *Williams* v. *New York City Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006) (quoting *Fitzgerald* v. *Henderson*, 251 F.3d 345, 359-60 (2d Cir. 2001). "This exception to the exhaustion requirement is essentially an allowance of loose pleading and is based on the recognition that EEOC charges frequently are filled out by employees without the benefit of counsel and that their primary purpose is to alert the EEOC to the discrimination that a plaintiff claims he is suffering." *Deravin* v. *Kerik*, 335 F.3d 195, 201 (2d Cir. 2003). To determine whether a claim is "reasonably related" to a claim included in an EEOC charge, courts should focus "on the factual allegations made in the EEOC charge itself, describing the discriminatory conduct about which a plaintiff is grieving," and ask the "central question" of "whether the complaint filed with the EEOC gave the agency adequate notice to investigate discrimination on both bases." *Williams*, 458 F.3d at 70.

23

Plaintiff's EEOC Charge is devoid of any facts relating to the demotion/failure to promote and disability claims that she brings before this Court. Rather, the EEOC Charge focuses on Plaintiff's hostile work environment, retaliation, and national origin discrimination claims. Consequently, there was nothing in the EEOC Charge that would have given the agency adequate notice to investigate Plaintiff's allegations of discrimination concerning her disability or her demotion to Family Worker. Because Plaintiff did not exhaust her Title VII and ADA claims based on her disability and demotion, and because these claims cannot be said to be reasonably related to the conduct actually alleged in Plaintiff's EEOC Charge, Defendant's summary judgment motion as to these claims is granted. *See DiProjetto* v. *Morris Protective Serv.*, 306 F. App'x 687, 688 (2d Cir. 2009) (holding that plaintiff's claims under Title VII and the ADA were properly dismissed because plaintiff failed to include those claims in his EEOC charge) (summary order); *McNamee* v. *Starbucks Coffee Co.*, 914 F. Supp. 2d 408, 417 (W.D.N.Y. 2012) (granting summary judgment and concluding that the ADA claim was not "reasonably related" to the claims that were included in the EEOC complaint; the "EEOC's actual investigation into Plaintiff's complaint only addressed discrimination on the basis of age and gender, not disability").

## 2. Plaintiff's Title VII Claims Accruing Prior to June 11, 2009 Are Barred by the Statute of Limitations

Next, Defendant argues that any of Plaintiff's Title VII claims alleging discriminatory conduct occurring prior to June 11, 2009, is barred by the

statute of limitations.  (Def. Br. 3).  These include Plaintiff's claims that she was demoted to Fraud Investigator on February 23, 2009, and that Njideka Kelley submitted disciplinary reports concerning Plaintiff in 2007.  (*Id.*).

"An aggrieved employee wishing to bring a Title VII claim in district court must file an administrative complaint with the EEOC within 300 days of the alleged discriminatory act." *Petrosino* v. *Bell Atl.*, 385 F.3d 210, 219 (2d Cir. 2004); *see also Baroor* v. *New York City Dep't of Educ.*, 362 F. App'x 157, 159 (2d Cir. 2010) ("For a Title VII claim arising in New York to be timely, a plaintiff must file the charge with the Equal Employment Opportunity Commission ('EEOC') within 300 days of the allegedly unlawful employment practice.") (summary order); 42 U.S.C. § 2000e-5(e).

An exception to the 300-day statute of limitations exists where plaintiff establishes a "continuing violation." *Nat'l R.R. Passenger Corp.* v. *Morgan*, 536 U.S. 101, 113 (2002).  Under this exception, "if a Title VII plaintiff files an EEOC charge that is timely as to any incident of discrimination of an ongoing policy of discrimination, all claims of acts of discrimination under that policy will be timely even if they would be untimely standing alone." *Hongyan Lu* v. *Chase Inv. Serv. Corp.*, 412 F. App'x 413, 416 (2d Cir. 2011) (summary order). The Second Circuit, however, has "cautioned … that while this theory may apply to 'cases involving specific discriminatory policies or mechanisms, … multiple incidents of discrimination, even *similar ones*, that are not the result of a discriminatory policy or mechanism do not amount to a continuing

25

violation'." *Id.* (citing *Lambert* v. *Genessee Hosp.*, 10 F.3d 46, 53 (2d Cir. 1993) (emphasis in original)).

Plaintiff filed her EEOC Charge on April 7, 2010.  (Def. 56.1, Exh. Q). Consequently, claims accruing prior to June 11, 2009 (i.e., 300 days before Plaintiff's EEOC Charge was filed), are untimely.  The record demonstrates that Plaintiff's claim for demotion that accrued on February 23, 2009 — even assuming it were not already barred for failure to exhaust administrative remedies — was not timely asserted.  "Discrete acts of discrimination, including demotion … cannot be the basis for recovery by a plaintiff if they occurred outside the 300 day period." *McGrath* v. *Thomson Reuters*, No. 10 Civ. 4944 (JSR) (JCF), 2012 WL 2119112, at *9 (S.D.N.Y. Apr. 30, 2012) (Report and Recommendation); *cf. Petrosino*, 385 F.3d at 220 ("The law is clear that … promotion claims may not be based on discrete acts falling outside the limitation period.").  For similar reasons, the continuing violation exception is inapplicable to Plaintiff's demotion claim.  *LaBeach* v. *Nestle Co., Inc.*, 658 F. Supp. 676, 688 (S.D.N.Y. 1987) ("[T]he case law in this area indicates that a demotion, like a termination, is a discrete act which is consummated at the time it is made, and is not of a continuing nature.").  Plaintiff's claims that Kelley discriminated against Plaintiff in 2007, presumably based on her national origin, are likewise barred by the statute of limitations, because Plaintiff failed to timely assert those claims, and because there is no evidence

in the record that those claims were the "result of a discriminatory policy or mechanism."

Finally, Plaintiff has not alleged, and the Court does not find, any reason for equitable tolling of the statute of limitations so as to render Plaintiff's demotion claim timely. *Baroor*, 362 F. App'x at 159 ("Equitable tolling is, however, 'only appropriate in rare and exceptional circumstances, in which a party is prevented in some extraordinary way from exercising his rights.'" (quoting *Zerilli-Edelglass* v. *New York City Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003))). Accordingly, Plaintiff's claims accruing before June 11, 2009, including Plaintiff's demotion claim and allegations of discriminatory conduct by Kelley in 2007, are dismissed. Moreover, to the extent that Plaintiff has alleged claims without identifying the date on which those claims occurred, any of those claims that accrued prior to June 11, 2009, is dismissed.

### 3.   Plaintiff's Claims Under the NYSHRL and the NYCHRL for Discriminatory Conduct Allegedly Occurring in 2007 Are Time-Barred

As a third claim of procedural bar, Defendant argues that Plaintiff's claims under the NYSHRL and the NYCHRL for conduct occurring before February 1, 2009, are time-barred. (Def. Br. 4). As Defendant correctly identifies, the statute of limitations for claims under the NYSHRL and the NYCHRL is three years from the date that the claim accrues. *Quinn* v. *Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir. 1998) ("[Plaintiff's] cause of action under New York's Human Rights Law is governed by a three-year statute of

limitations, measured from the filing of the action in court."), *abrogated in part by Nat'l R.R. Pass. Corp.*, 536 U.S. 101 (limiting the strict application of the statutory period to "discrete" acts of harassment); *see also E.E.O.C.* v. *Bloomberg L.P.*, — F. Supp. 2d —, No. 07 Civ. 8383 (LAP), 2013 WL 4799161, at *3 (S.D.N.Y. Sept. 9, 2013); N.Y. C.P.L.R. § 214(2).  Defendant fails to account, however, for the fact that the limitations period is tolled "during the period in which a complaint is filed with the EEOC and the issuance by the EEOC of a right-to-sue letter."  *Bloomberg L.P.*, 2013 WL 4799161, at *3; *Esposito* v. *Deutsche Bank AG*, No. 07 Civ. 6722 (RJS), 2008 WL 5233590, at *5, (S.D.N.Y. Dec. 16, 2008) ("Although the Second Circuit has yet to definitely opine on the issue of whether the filing of a charge with the EEOC serves to automatically toll the statute of limitations on claims asserted under NYSHRL and NYCHRL, numerous courts in this Circuit have held that the three-year statute of limitations applicable to claims under NYSHRL and NYCHRL is tolled during the period in which a complaint is filed with the EEOC." (internal quotation marks omitted) (collecting cases)); *Harris* v. *NYU Langone Med. Ctr.*, No. 12 Civ. 0454 (RA) (JLC), 2013 WL 3487032, at *23 (S.D.N.Y. July 9, 2013) (Report and Recommendation) (same).

Plaintiff filed her EEOC charge on April 7, 2010, and received her Right to Sue letter on November 2, 2011.  (Dkt. #2).  As a result, her claims under the NYSHRL and the NYCHRL were tolled for 208 days, while any claim accruing prior to July 7, 2008, would be time-barred.  For this reason as well,

28

Plaintiff's claims under the NYSHRL and the NYCHRL that Njideka Kelley
discriminated against her in 2007 are dismissed.

### 4.  Plaintiff Fails to Establish a Prima Facie Case of Discrimination Based on Disability or National Origin

Defendant also advances several substantive challenges to Plaintiff's
claims, including, most particularly, a claim that Plaintiff has failed to
establish a prima facie case of discrimination of any type.  By way of
background, Plaintiff's claims for employment discrimination premised on her
disability (under the ADA) and her national origin (under Title VII) are analyzed
under the familiar burden-shifting approach set forth by the Supreme Court in
*McDonnell-Douglas Corp.* v. *Green*, 411 U.S. 792 (1973).[15]  *See Taddeo* v. *L.M.
Berry and Co.*, 526 F. App'x 121, 122 (2d Cir. 2013) ("At the summary-
judgment stage, properly exhausted Title VII claims are ordinarily analyzed
under the familiar burden-shifting framework of *McDonnell Douglas Corp.* v.
*Green*, and its progeny." (internal citations omitted)) (summary order); *Reg'l
Econ. Cnty. Action Program, Inc.* v. *City of Middletown*, 294 F.3d 35, 48-49 (2d
Cir. 2002) ("We analyze claims of intentional discrimination under … the
ADA … under the familiar *McDonnell Douglas Corp.* v. *Green*, burden-shifting
analysis established for employment discrimination cases under Title VII of the
Civil Rights Act of 1964." (internal citation omitted)); *see also Raytheon Co.* v.

---

[15] "Discrimination claims under Title VII and the NYSHRL are governed by the burden
shifting framework laid out in *McDonnell Douglas Corp.*"  *Lugo* v. *City of New York*, 518
F. App'x 28, 29 (2d Cir. 2013) (summary order).  Plaintiff's claim under the NYCHRL is
assessed separately below.

29

*Hernandez*, 540 U.S. 44, 53 (2003) (applying *McDonnell Douglas* burden-shifting analysis to an ADA claim).

Under this framework, "a plaintiff 'bears the burden of establishing a prima facie case of discrimination,' which includes demonstrating that 'he suffered an adverse employment action ... under circumstances giving rise to an inference of discriminatory intent." *Maraschiello* v. *City of Buffalo Police Dep't.*, 709 F.3d 87, 92 (2d Cir. 2013) (quoting *Mathirampuzha* v. *Potter*, 548 F.3d 70, 78 (2d Cir. 2008)). "'Once the prima facie case has been shown, the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action." *Id.* (quoting *United States* v. *Brennan*, 650 F.3d 65, 93 (2d Cir. 2011).

### a.   Plaintiff Cannot Establish a Prima Facie Case of National Origin Discrimination

"Under Title VII of the Civil Rights Act of 1964, 'it shall be unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Faragher* v. *City of Boca Raton*, 524 U.S. 775, 786 (1998) (quoting 42 U.S.C. § 2000e-2(a)(1)). Significantly, and as the Supreme Court has recognized, Title VII does not set forth "a general civility code for the American workplace." *Burlington N. and Santa Fe Ry. Co.* v. *White*, 548 U.S. 53, 68 (2006). To establish a prima facie case of intentional discrimination, as Plaintiff claims here, Plaintiff must show

30

that (i) she is a member of a protected class; (ii) she was qualified for the position she held; (iii) she suffered an adverse employment action; and (iv) the adverse action took place under circumstances giving rise to an inference of discrimination.  *See, e.g., Reynolds* v. *Barrett*, 685 F.3d 193, 202 (2d Cir. 2012); *Ruiz* v. *Cnty of Rockland*, 609 F.3d 486, 491-92 (2d Cir. 2010).

Defendant argues that Plaintiff cannot demonstrate an adverse employment action (Def. Br. 7), and, even if she could, Plaintiff cannot establish that such action took place under circumstances giving rise to an inference of discrimination (Def. Br. 10).  A review of the record reveals abundant support for Defendant's arguments, and scant, if any, support for Plaintiff's arguments in opposition.

An adverse employment action is a "materially adverse change in the terms and conditions of employment" that "is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Brown* v. *City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012).  "Employment actions" that have been "deemed sufficiently disadvantageous to constitute an adverse employment action include 'a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices … unique to a particular situation.'" *Breyer* v. *Cnty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (quoting *Williams* v. *R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004)).

31

Plaintiff did not identify which employment actions she claimed were adverse. Yet, in the interest of reading *pro se* Plaintiff's pleadings broadly, the Court discerns the following allegations to concern adverse employment actions:

(i)    Plaintiff was demoted to Fraud Investigator in February 2009. (Def. 56.1, Exh. E; Pl. Dep. 29:22-25).

(ii)    Plaintiff was required to submit a doctor's note when she took leave to attend a doctor's appointment. (Pl. Dep. 17:17-22).

(iii)    Plaintiff was offered FMLA leave. (*Id.*).

(iv)    Plaintiff was told by her supervisor to take time off if her disability prevented her from working. (*Id.* at 17:23-7).

(v)    Plaintiff was spoken to in a demeaning manner in or around April or May 2009. (*Id.* at 18:1-19:19).

(vi)    Plaintiff received a lower salary than other employees with the same job title. (*Id.* at 31:16-32:3).

(vii)    In 2010, Michelle Pegram had Plaintiff's personal belongings and work files placed in the office basement. (*Id.* at 53:16-54:3).

(viii)    In 2012, Pegram instructed Plaintiff to inform Plaintiff's supervisor when she left her desk. (*Id.* at 34:12-36:10).

(ix)    Plaintiff was not paid when she was marked absent without leave for one day. (*Id.* at 36:13-38:6).

(x)    In the fourth quarter of 2012, Plaintiff was prohibited from having a union representative present during a non-disciplinary meeting. (*Id.* at 39:8-41:24).

(xi)    In 2012, Pegram took away one of Plaintiff's cases. (*Id.* at 43:15-19).

(xii)    Plaintiff's supervisors failed to address Plaintiff's complaints about her supervisors. (*Id.* at 44:2-14, 46:2-23).

(xiii)   Pegram requested that other supervisors augment her
disciplinary letter regarding Plaintiff.  (*Id.* at 44:12-45:13).

(xiv)   Pegram, along with other supervisors, wrote up Plaintiff with
respect to Plaintiff not completing her work properly.  (*Id.* at
47:19-50:20).

Of these, only Plaintiff's demotion claim and her allegation that she
received a lower salary could qualify as adverse employment actions.  Plaintiff's
remaining allegations — which plainly do not implicate a change in the "terms
and conditions" of Plaintiff's employment — fall generally under the rubrics of
standard disciplinary measures, supervisory inaction, and typical workplace
procedures.  Such allegations, even if true, would not suffice to constitute an
adverse employment action.  *Brown*, 673 F.3d at 150 ("[A]n employee does not
suffer a materially adverse change in the terms and conditions of employment
where the employer merely enforces its preexisting disciplinary policies in a
reasonable manner."); *Joseph* v. *Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006) (same);
*Weeks* v. *New York State (Div. of Parole)*, 273 F.3d 76, 86-87 (2d Cir. 2001)
(finding that conduct to implement a "well-run office," including removing
Plaintiff's files to another location, is not an adverse employment action),
*abrogated on other grounds by Nat'l R.R. Passenger Corp.*, 536 U.S. 101; *Smalls*
v. *Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005) ("[B]eing yelled at,
receiving unfair criticism, receiving unfavorable schedules or work
assignments do not rise to the level of adverse employment action because they
do not have a material impact on the terms and conditions of Plaintiff's
employment" (internal quotation marks omitted)); *Durant* v. *Nynex*, 101 F.

Supp. 2d 227, 233 (S.D.N.Y. 2000). ("Negative evaluations alone, without any accompanying adverse result, however, are not cognizable."); *Valentine* v. *Standard & Poor's*, 50 F. Supp. 2d 262, 284 (S.D.N.Y. 1999) ("[N]egative reviews did not lead to any immediate tangible harm or consequences[,]" and therefore, "do not constitute adverse actions materially altering the conditions of [] employment"), *aff'd*, 205 F.3d 1327 (2d Cir. 2000); *Stembridge* v. *City of N.Y.*, 88 F. Supp. 2d 276, 283 (S.D.N.Y. 2000) (no adverse employment action found with respect to a warning that advised Plaintiff that continuation of improper behavior could lead to disciplinary action); *Nicastro* v. *Runyon*, 60 F. Supp. 2d 181, 186 (S.D.N.Y. 1999) ("[M]any of the actions complained of by plaintiff, such as scrutiny from his supervisors that he deemed excessive, requiring documentation for sick leave, scrutiny of his wife's sick leave, the unexplained absence of certain documents that he thinks should be in his employment file, or threatening to investigate medical fraud, do not constitute 'adverse employment actions.'"); *Hayes* v. *Kerik*, 414 F. Supp. 2d 193, 203 (E.D.N.Y. 2006) (holding that failing to properly investigate a plaintiff's discrimination complaint does not constitute an adverse employment action).

Plaintiff's allegation that, after her demotion, she received a lower salary than other employees with her title (ostensibly because of what Kelley told Plaintiff's supervisors) may be a cognizable adverse employment action. *Breyer*, 524 F.3d at 163 ("[A]n adverse employment action include[s] … a demotion evidenced by a decrease in wage or salary."); *Galabya* v. *New York*

34

*City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (same).  As to this issue, however, Plaintiff cannot establish the final element of her prima facie case — that the adverse action took place under circumstances giving rise to an inference of discrimination — so as to defeat Defendant's motion for summary judgment.

An inference of discrimination may be discerned from a variety of circumstances, including, as relevant here, "the employer's criticism of the plaintiff's performance in ethnically degrading terms," the employer's "invidious comments about others in the employee's protected group," or "the more favorable treatment of employees not in the protected group."  *Chambers* v. *TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).  The Second Circuit "has repeatedly held that stray remarks of a decision-marker, without more, cannot prove a claim of employment discrimination."  *Adams* v. *Master Carvers of Jamestown, Ltd.*, 91 F. App'x 718, 722 (2d Cir. 2004) (summary order).  "In order for the remarks to be deemed significant, the plaintiff must show their nexus to the adverse employment decision."  *Id.* at 722-23.

Plaintiff testified at her deposition that, in 2007, Njideka Kelley stated that people from Sierra Leone were "from a small country," that it is a "poor country," and that Plaintiff was "very assertive" "[f]or somebody that came from a small country."  (Pl. Dep. 67:6-16).  Plaintiff also alleged that Ambrose Okojie made a discriminatory comment to her in 2010 based on her national origin by saying that he was "going to put [Plaintiff] in [her] place" (*id.* at 69:5-16), and

35

by saying that people from Sierra Leone are "vicious," "mean," "evil" people who "cut people's arms and legs off when they are upset" (*id.* at 69:19-70:10), and that Plaintiff was from a "poor country" (*id.* at 70:13-15). Even assuming that Plaintiff's allegations regarding the 2007 comments were timely (which they were not), and even accepting these allegations as true, none of these statements amounts to anything more than a stray remark entirely dissociated from Plaintiff's claim that she received less salary after her demotion. This is particularly true for the statements by Okojie, which, it bears noting, were made after Plaintiff's salary had been adjusted.

More to the point, Plaintiff's own testimony evinces the lack of nexus between the alleged discriminatory statements and the purported reduction in salary, inasmuch as Plaintiff conceded that her salary was set by union contract, not her supervisors (Pl. Dep. 32:5-8), and that she was informed by a union representative that employees with her title received different salaries (*id.* at 32:16-22). On the record before the Court, there are no circumstances giving rise to an inference of discrimination. *Vilien* v. *Dep't of Educ. of City of New York*, No. 06 Civ. 3491 (BSJ), 2009 WL 857458, at *4 (S.D.N.Y. Mar. 31, 2009) ("It is well established that 'stray remarks without a demonstrated nexus to the complained of personnel actions, will not defeat the employer's motion for summary judgment.'" (citations omitted)).

As for Plaintiff's untimely demotion claim itself, the Court may not consider it as direct evidence of Plaintiff's prima facie case because, as

36

previously found, the claim was untimely.  *See Jute* v. *Hamilton Sundstrand Corp.*, 420 F.3d 166, 176 (2d Cir. 2005) (holding that allegations of adverse employment action that occurred outside the applicable filing period may be used as "background evidence" in support of a timely filed claim); *see also Weeks*, 273 F.3d at 85 (considering only whether timely allegations amounted to an adverse employment action).  Instead, as the Second Circuit explained in *Jute*,

> [t]he statute of limitations requires that only one alleged adverse employment action have occurred within the applicable filing period.  But, evidence of an earlier alleged retaliatory act may constitute relevant "background evidence in support of that timely claim."  Hence, relevant background evidence, such as statements by a decisionmaker or earlier decisions typifying the retaliation involved, may be considered to assess liability on a timely alleged act.

420 F.2d at 176-77.  This Court has considered the demotion claim for this limited purpose, and does not find that it raises any issue of material fact as to Plaintiff's ability to establish a prima facie case.[16]

---

[16]   Plaintiff has also failed to raise an issue of material fact as to Defendant's legitimate, non-discriminatory reason for her demotion.  *Summa* v. *Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) ("If the employer demonstrates a legitimate, non-discriminatory reason, then the 'the burden shifts back to the plaintiff to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation.").  The record makes plain that Plaintiff was not demoted due to any discriminatory motive, but rather because she did not place high enough on the rank order list that DHS used to promote provisional employees serving under her title.  (Def. 56.1, Exh. E).  Plaintiff's *ipse dixit* assertions that she was entitled to a promotion based solely on her score, and that candidates who failed the exam or did not qualify for the exam were appointed to higher positions than candidates who passed the exam, are insufficient to defeat Defendant's motion.  *Gorzynski*, 596 F.3d at 101 ("[A] plaintiff must provide more than conclusory allegations to resist a motion for summary judgment, and show more than 'some metaphysical doubt as to the material facts.").

Because Plaintiff can establish neither an adverse employment action nor an inference of discrimination, Defendant's motion for summary judgment as to Plaintiff's Title VII and NYSHRL national origin discrimination claims is granted.

### b.  Plaintiff Cannot Establish a Prima Facie Case of Disability Discrimination

For similar reasons, even were Plaintiff's ADA claim not procedurally barred, it would fail on the merits because Plaintiff cannot establish a prima facie case for discrimination based on disability.  The ADA prohibits an employer from discriminating against a "qualified individual with a disability because of the disability" in the "terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a); *Raytheon Co.*, 540 U.S. at 46.  To establish a violation of the ADA,

> [a] plaintiff must prove that: (1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning of the ADA; (3) plaintiff was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of her disability or perceived disability.

*Kinneary* v. *City of New York*, 601 F.3d 151, 155-56 (2d Cir. 2010).[17]

Plaintiff alleges that Defendant violated the ADA by discriminating against her based on her back and stomach-associated disabilities.  (Pl. Dep. 10:25-11:6).  For the purposes of this motion, Defendant does not dispute the

---

[17]    "A claim of disability discrimination under New York State Human Rights Law ... is governed by the same legal standards as govern federal ADA claims."  *Graves* v. *Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 n.3 (2d Cir. 2006)

38

first two elements, i.e., that Defendant is subject to the ADA, and that Plaintiff is disabled within the meaning of the ADA, the NYSHRL, or the NYCHRL.  (Def. Br. 6).  As to the third element, Defendant contends that "Plaintiff's inability to appear for work prevents her from establishing a prima facie case of disability discrimination."  (Def. Br. 7).  Defendant is correct.

Plaintiff's admission that she is unable to work — and, indeed, her failure to appear for work — prevent her from performing the essential functions of her job, and thereby preclude her from establishing a prima facie case of disability discrimination under the ADA.  *See Cleveland* v. *Policy Mgmt Sys. Corp.*, 526 U.S. 795, 806 (1999) ("[A] plaintiff's sworn assertion in an application for disability benefits that she is, for example, "unable to work" will appear to negate an essential element of her ADA case — at least if she does not offer a sufficient explanation."); *Rios* v. *Dep't of Educ.*, 351 F. App'x 503, 505 (2d Cir. 2009) (affirming district court's decision that plaintiff could not establish that she was "otherwise qualified" within the meaning of the ADA because she could not perform the essential function" of regularly showing up to work) (summary order); *Kendall* v. *Fisse*, 149 F. App'x 19, 21 (2d Cir. 2005) (plaintiff failed to establish that he was qualified to perform the essential functions of his job, where he stated in a benefits application submitted to the Social Security Administration that he was unable to work during the relevant time period) (summary order); *King* v. *Town of Wallkill*, 302 F. Supp. 2d 279, 289 (S.D.N.Y. 2004) ("An employee incapable of regular attendance is, however,

not qualified to perform the essential functions of a given position."); *Mazza* v. *Bratton*, 108 F. Supp. 2d 167, 175 (S.D.N.Y. 2000) ("An individual is not qualified for his position if he is unable to come to work."), *aff'd*, 9 F. App'x 36 (2d Cir. 2001) (summary order).  Accordingly, Defendant's motion for summary judgment as to Plaintiff's ADA claim is granted.

> **5.    Plaintiff Cannot Establish a Claim for National Origin or Disability Discrimination Under the NYCHRL**[18]

Plaintiff's discrimination claims under the NYCHRL also cannot survive summary judgment.  "While the NYCHRL is indeed reviewed 'independently from and more liberally than' federal or state discrimination claims, it still requires a showing of some evidence from which discrimination can be inferred."  *Ben-Levy* v. *Bloomberg L.P.*, 518 F. App'x 17, 19-20 (2d Cir. 2013) (quoting *Loeffler* v. *Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009)) (summary order); *see also Lugo*, 518 F. App'x at 30 (same); *Mihalik* v. *Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 113 (2d Cir. 2013) ("[A] defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by discriminatory … motives, or if the defendant proves the conduct was nothing more than 'petty slights or trivial inconveniences.'" (quoting *Williams* v. *New York City Hous. Auth.*, 872 N.Y.S.2d 27, 41 (2009))); *cf. Matter of McEniry* v. *Landi*, 84 N.Y.2d 554, 558 (1994) ("A complainant states a

---

[18]    Although the parties fail to discuss with any specificity whether Plaintiff's claims under the NYCHRL should remain, Defendant has moved for summary judgment on all of Plaintiff's claims.  For this reason, the Court will consider Plaintiff's claims under the NYCHRL as appropriate.

prima facie case of discrimination if the individual suffers from a disability and the disability caused the behavior for which the individual was terminated."). As discussed with reference to Plaintiff's claims under Title VII and the NYSHRL, the record is devoid of *any* evidence upon which a reasonable jury could find an inference of discrimination based on Plaintiff's national origin or disability. Thus, Plaintiff cannot meet even this lesser burden. Defendant's motion for summary judgment as to Plaintiff's claims for discrimination based on national origin and disability under the NYCHRL is granted.

### 6. Plaintiff Cannot Establish a Prima Facie Case of Retaliation

#### a. Plaintiff's Title VII and NYSHRL Claims

Plaintiff's next collection of claims concerns alleged retaliatory conduct. To establish a prima facie case of retaliation under Title VII, "a plaintiff must demonstrate that "(1) she engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Kelly* v. *Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013). "The standard[] for evaluating...[a] retaliation claim[] is identical under Title VII and the NYSHRL." *Id.* "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68. This is a broader standard than the "adverse

employment action" standard discussed previously.  *Millea* v. *Metro-North R. Co.*, 658 F.3d 154, 164 (2d Cir. 2011) (noting that *Burlington Northern* expanded the definition of "materially adverse employment action" for purposes of Title VII retaliation).

As the Supreme Court made clear in *Burlington*, Title VII "protects an individual not from all retaliation, but from retaliation that produces an injury or harm."  *Burlington*, 548 U.S. at 67.  By contrast, "[a]ctions that are 'trivial harms' — i.e., 'those petty slights or minor annoyances that often take place at work and that all employees experience' — are not materially adverse." *Tepperwien* v. *Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011) (quoting *Burlington*, 548 U.S. at 68).  As the Second Circuit explained:

> Material adversity is to be determined objectively, based on the reactions of a reasonable employee.  "Context matters," as some actions take on more or less significance depending on the context. Alleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct.

*Id.* (quoting *Burlington*, 548 U.S. at 68).

Plaintiff has alleged a litany of retaliatory conduct, much of which this Court has reviewed in the context of evaluating Plaintiff's discrimination claim. As far as the Court can glean from the record, Plaintiff's retaliation claims encompass the following conduct:

(i)   In 2011, Sandoval changed Plaintiff's password to her e-mail account, and required Plaintiff to obtain a new password from Sandoval.  (Pl. Dep. 79:11-81:22).

(ii)  Sandoval is later alleged to have deleted Plaintiff's e-mails. (*Id.* at 81:23-82:4).

42

(iii)     Sandoval put post-it notes on Plaintiff's desk.  (*Id.* at 83:18-20).

(iv)     Between October and November 2011, Plaintiff was told to take lunch at a designated time.  (*Id.* at 84:10-85:20).

(v)     Plaintiff was instructed to inform Sandoval when she was leaving her desk.  (*Id.* at 85:21-86:9).  Plaintiff was also required to call her supervisors "every fifteen minutes" and tell them where she was going in the building.  (*Id.* at 100:13-24).

(vi)     In or around 2009 and 2011, Sandoval "holler[ed]" at Plaintiff in the office, told Plaintiff she was acting like a child and did not know her work, and asked Plaintiff if she was going home.  (*Id.* at 86:10-87:21, 88:25-89:10).

(vii)     Sandoval wrote up Plaintiff for leaving work to get her paycheck in October or November 2011.  (*Id.* at 88:19-24).

(viii)     Plaintiff's complaints against her supervisors were not addressed.  (*Id.* at 90:2-11,101:2-13).

(ix)     Pegram instructed Sandoval to write up Plaintiff for abandoning her post in January 2012, and on another occasion asked Plaintiff's supervisors to add to a disciplinary letter about Plaintiff.  (*Id.* at 90:19-25, 94:11-17).

(x)     One of Plaintiff's cases was taken away in late 2011 or early 2012.  (*Id.* at 91:6-92:7).

(xi)     In or around the end of 2011, Plaintiff's coat was removed from her cubicle door to her desk or chair.  (*Id.* at 92:10-94:5).

(xii)     Plaintiff was offered FMLA leave in 2012.  (*Id.* at 94:24-95:23).

(xiii)     Okojie told Plaintiff's supervisors that Plaintiff did not know what she was doing.  (*Id.* at 96:5-97:24).

(xiv)     Okojie was present at a meeting where Sandoval stated that Plaintiff did not know what she was doing.  (*Id.* at 97:11-24).

(xv)     Plaintiff's pay was delayed for three pay periods. (*Id.* at 100:6-9).

Defendant argues that Plaintiff is unable to demonstrate that any of the

claimed retaliatory acts constitute a materially adverse employment action or

43

possess a causal connection between the protected activity and the
employment action.  (Def. Br. 18-19).  Defendant is correct.

As an initial matter, Plaintiff filed her EEOC Charge on April 7, 2010.
Consequently, any allegations that predate the filing of the EEOC Charge
cannot support Plaintiff's retaliation claim.  This includes, even assuming it
would qualify as a materially adverse action, Plaintiff's allegation that Sandoval
wrote up Plaintiff in March of 2009 for failing to clock in and out, and for
failing to inform Sandoval that she returned from leave.  (Pl. Dep. 77:10-79:10).

In any event, most of Plaintiff's allegations fall within the realm of
prototypical workplace incidents that are not actionable under Title VII's anti-
retaliation provision.  *Burlington*, 548 U.S. at 68 ("[P]ersonality conflicts at work
that generate antipathy and snubbing by supervisors and co-workers are not
actionable." (quoting 1 Barbara Lindemann & Paul Grossman, Employment
Discrimination Law 669 (3d ed. 1996) (internal quotation marks omitted));
*Tepperwien*, 663 F.3d at 571-72 (threat of termination that was not acted
upon, comments and stare during employee meeting, and being forced to
switch from a day shift to a night shift were "trival harms" and "petty slights or
minor annoyances"); *Rivera* v. *Rochester Genesee Reg'l Transp. Auth.*, 702 F.3d
685, 699-700 (2d Cir. 2012) (receiving two disciplinary citations for
insubordination over a two-year period found not to be a materially adverse
action where company was enforcing its standard disciplinary practices);
*Avillan* v. *Donahoe*, 483 F. App'x 637, 638 (2d Cir. 2012) ("Appellant complains

only of minor workplace inconveniences, such as being replaced as acting group leader, having his custodial route reassigned, and having personal items removed from a locker. These actions are not materially adverse." (internal quotation marks omitted)) (summary order); *Platt* v. *Inc. Vill. of Southampton*, 391 F. App'x 62, 64 (2d Cir. 2010) ("[T]he requirement that all officers on leave regularly report to their supervisors and be available throughout the course of the day, while certainly an added inconvenience, does not constitute a materially adverse employment action against [Plaintiff].") (summary order).

There is an issue of material fact as to whether Plaintiff's pay being delayed for three pay periods constitutes a materially adverse action. *See Burlington*, 548 U.S. at 73 ("[T]he jury's conclusion that the 37-day suspension without pay was materially adverse was a reasonable one."). Despite this showing, and even assuming that any of Plaintiff's other aforementioned acts qualifies as a materially adverse action, Plaintiff simply cannot demonstrate a causal connection between the filing of her EEOC Charge and any of the alleged retaliatory conduct. The relevant actions taken by Plaintiff's supervisors occurred long after Plaintiff filed her EEOC Charge, and were either in response to Plaintiff's insubordinate behavior or the product of Plaintiff working within a bureaucratic environment.

Considering, for example, Plaintiff's allegation regarding her salary being delayed, the claim is that Plaintiff's pay was allegedly delayed starting in October 2011 (*id.* at 36:13-38:6), approximately six months after she filed her

45

EEOC Charge. The lack of temporal proximity between the protected activity and the alleged retaliatory conduct underscores the absence of any causal connection. *Cf. Gorzynski*, 596 F.3d at 110 ("'[A] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action.'" (quoting *Gorman-Bakos* v. *Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001))). Moreover, Plaintiff confirmed that she received any salary that was delayed (Pl. Dep.100:10-12), thereby eliminating any inference that her salary was being withheld on a retaliatory basis. The same can be said for Plaintiff's claims regarding being written up. In each instance, Plaintiff was not written up until six or more months had passed after the filing of the EEOC Charge, and in all instances, Plaintiff admits that the disciplinary letters were spurred by her failing to adhere to company policy.

Because Plaintiff has alleged no facts on which a reasonable jury could conclude that there was a causal connection between Plaintiff filing her EEOC Charge, and any of the alleged retaliatory conduct, Defendant's motion for summary judgment on Plaintiff's retaliation claim is granted.

### b. Plaintiff's NYCHRL Claim

Retaliation claims under the NYCHRL cover a broader range of conduct. "[T]o prevail on a retaliation claim under the NYCHRL, the plaintiff must show that she took an action opposing her employer's discrimination, and that, as a

46

result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik*, 715 F.3d at 112 (internal citation omitted).  The Second Circuit has instructed, however, that "the NYCHRL is not a general civility code, and a defendant is not liable if the plaintiff fails to prove the conduct is caused at least in part by … retaliatory motives, of if the defendant proves the conduct was nothing more than 'petty slights or trivial inconveniences.'"  *Id.* at 113 (quoting *Williams*, 872 N.Y.S.2d at 41.

As noted, most of Plaintiff's alleged retaliatory conduct falls squarely within the sphere of "petty slights or trivial inconveniences."  Nonetheless, with respect to those allegations and the potentially actionable conduct, i.e., the delay in Plaintiff's salary, Plaintiff has failed to raise any factual issue as to the alleged conduct being caused by a retaliatory motive.  Defendant, therefore, cannot be liable to Plaintiff for violating the NYCHRL's anti-retaliation provision.

Accordingly, Defendant's motion for summary judgment as to Plaintiff's claim for retaliation under Title VII, the NYSHRL, and the NYCHRL is granted.

### 7.   A Material Issue of Fact Exists as to Whether Plaintiff Can Establish a Claim for Hostile Work Environment

#### a.   Plaintiff Has Demonstrated a Material Issue of Fact

While Defendant has been successful in identifying the procedural and substantive defects with most of Plaintiff's claims, one claim — that of gender discrimination by means of a hostile work environment — remains.  "An

47

employer violates Title VII's prohibition of discrimination on the basis of sex when it allows the working environment to become 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Holtz,* 258 F.3d at 74 (quoting *Harris* v. *Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "'[I]n order to be actionable under the statute, a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim did in fact perceive to be so.'" *Id.* at 75 (quoting *Faragher*, 524 U.S. at 787 (1998)).

To prove a hostile work environment claim, "[a] plaintiff must show that 'a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [her] working environment.'" *Chukwuka* v. *City of New York*, 513 F. App'x 34, 35-36 (2d Cir. 2013) (quoting *Cruz* v. *Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000)) (summary order). "If a plaintiff relies on a series of incidents, they must be 'more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Desardouin* v. *City of Rochester*, 708 F.3d 102, 105 (2d Cir. 2013) (quoting *Perry* v. *Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)).

"The question of whether a work environment is sufficiently hostile to violate Title VII is one of fact.  Summary judgment is appropriate only if it can

be concluded as a matter of law that no rational juror could view the
defendant's conduct as an intolerable alteration of the plaintiff's working
conditions." *Holtz*, 258 F.3d at 75 (internal quotation marks omitted).

Defendant argues that Plaintiff's hostile work environment claim must
fail as a matter of law because the alleged conduct "does not demonstrate
sufficient regularity or pervasiveness necessary to demonstrate a hostile work
environment claim." (Def. Br. 14).  In making this argument, however,
Defendant misperceives the scope of Plaintiff's allegations.  Defendant
identifies, as alleged acts constituting a hostile work environment, Okojie's
statements to Plaintiff "on one occasion, while holding his private part, 'I want
to f— you,'" and that "if [Plaintiff] lost her support system, she would 'succumb'
to [Okojie's] needs," as well as the allegation that Okojie "slapped [P]laintiff's
buttocks once." (*Id.*).  Plaintiff's deposition testimony alleges considerably
more.  In addition to the incidents identified by Defendant, Plaintiff alleged
discriminatory conduct originating in 2007 (Pl. Dep. 71:14-72:23);[19] she

---

[19]     Although Plaintiff's conduct in 2007 falls outside the applicable limitations period (and
thus is not actionable in and of itself), the Court may consider this evidence when
determining liability because Plaintiff has alleged conduct contributing to her hostile
work environment claim that occurred within the statutorily prescribed time frame.
*McGullam* v. *Cedar Graphics, Inc.*, 609 F.3d 70, 75 (2d Cir. 2010) ("[C]onsideration of the
entire scope of a hostile work environment claim, including behavior alleged outside the
statutory time period, is permissible for the purposes of assessing liability, so long as
one act contributing to that hostile work environment takes place within the statutory time
period."); *Petrosino*, 385 F.3d at 220 ("[I]n the case of a hostile work environment claim,
the statute of limitations requires that only one sexually harassing act demonstrating
the challenged work environment occur within 300 days of filing; once that is shown, a
court and jury may consider 'the entire time period of the hostile environment' in
determining liability." (quoting *Nat'l R.R. Passenger Corp.*, 536 U.S. at 117)).

recounted Okojie telling her on more than one occasion that he wanted to "f—"
her (*id.* at 56:4-17);[20] she perceived Okojie's conduct as "threatening" to her;
and she considered Okojie to be "constantly sexually harassing" her (*id.* at
56:16-17).

Although the issue is a close one, the Court finds that the alleged
conduct is sufficient to defeat a motion for summary judgment. In this regard,
the Second Circuit's recent decision in *Desardouin* v. *City of Rochester*, in
which the Circuit held that a claim of a hostile work environment "suffice[d] to
warrant a trial," 708 F.3d at 104, is instructive. There, the plaintiff alleged that
her supervisor made "sexual advances toward her and one of her co-
plaintiffs … on a weekly basis" for approximately two to three months, in that
the supervisor told the plaintiff that "her husband was 'not taking care of [her]
in bed.'" *Id.* at 105. In reversing in part the district court's grant of summary
judgment, the Second Circuit reasoned:

> Though not threatening, they were more than merely offensive. For
> a male to say to a female employee under his supervision that her
> husband was "not taking care of [her] in bed" is the sort of remark
> that can readily be found to be a solicitation for sexual relations
> coupled with a claim of sexual prowess and can just as readily be
> found to have been perceived as such by the female employee. The
> weekly repetition of such a remark over several weeks only served
> to reinforce its offensive meaning and to make sexual intimidation,
> ridicule, and insult a pervasive part of Desardouin's workplace,
> effectively changing the terms and conditions of her employment.
> Indeed, Desardouin's affidavit stated that she found McIntyre

---

[20]    The number of times that Okojie made this statement is unclear. Plaintiff testified that
the statement was made each time she submitted a case assignment to Okojie. Thus, it
is conceivable that Okojie made these statements to Plaintiff on a consistent basis
during the time he was her supervisor.

"threatening," and that he made "sexual advances" toward her and
another employee. The allegations of repeated solicitation of sexual
relations in a vulgar and humiliating manner suffice to warrant a
trial.

*Id.* at 105-06 (internal citation omitted).

The alleged conduct here surpasses the allegations found to be sufficient

in *Desardouin*. Plaintiff therefore raises an issue of material fact as to whether

she was subject to a hostile work environment in violation of Title VII, an issue

appropriately left to the jury.

### b.   Okojie's Conduct May Be Imputed to Defendant

Defendant contends that even assuming Plaintiff could establish a claim

for hostile work environment, Defendant is insulated from liability under what

is commonly referred to as the "*Ellerth/Faragher* defense." (Def. Br. 16-17).[21]

That defense provides that if a plaintiff's

supervisor's harassment culminates in a tangible employment
action, the employer is strictly liable. But if no tangible
employment action is taken, the employer may escape liability by
establishing, as an affirmative defense, that (1) the employer
exercised reasonable care to prevent and correct any harassing
behavior and (2) that the plaintiff unreasonably failed to take

---

[21]   In *Burlington Indus., Inc.* v. *Ellerth*, 524 U.S. 742, 764-65 (1998), and *Faragher* v. *City of
Boca Raton*, 524 U.S. 775, 807 (1998), decided on the same day, the Supreme Court
held:

An employer is subject to vicarious liability to a victimized employee for
an actionable hostile environment created by a supervisor with
immediate (or successively higher) authority over the employee. When no
tangible employment action is taken, a defending employer may raise an
affirmative defense to liability or damages, subject to proof by a
preponderance of the evidence []. The defense comprises of two
necessary elements: (a) that the employer exercised reasonable care to
prevent and correct promptly any sexually harassing behavior, and
(b) that the plaintiff employee unreasonably failed to take advantage of
any preventative or corrective opportunities provided by the employer or
to avoid harm otherwise.

51

advantage of the preventive or corrective opportunities that the employer provided.

*Vance* v. *Bell State University*, 133 S. Ct. 2434, 2439 (2013).  "A tangible employment action … constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Ellerth*, 524 U.S. at 761.

Plaintiff averred that during the time of the alleged hostile work environment, and even after she was transferred to a different unit, her title and position remained the same.  (Pl. Dep. 65:20-23).  As such, Plaintiff has not suffered a tangible employment action from which strict liability on Defendant could be imparted.

The record does, however, demonstrate an issue of material fact concerning whether Defendant exercised reasonable care to prevent and correct the allegedly harassing behavior.  Although Plaintiff was ultimately transferred to a different unit after complaining to Rebecca Chu, her deposition testimony suggests that that no action was taken when she initially complained to her immediate supervisor.  Indeed, Plaintiff testified that Defendant "wanted to squash" the matter, and that "[n]o one came forward to do anything."  (Pl. Dep. 64:13-18).  Consequently, the record does not afford Defendant entitlement to the *Ellerth/Faragher* affirmative defense as a matter of law.

### c. Defendant's Motion for Summary Judgment as to Plaintiff's Hostile Work Environment Claim Under New York State's and New York City's Human Rights Laws Must Also Be Denied

Plaintiff also brings a claim for hostile work environment under the NYSHRL and the NYCHRL. Clams under the NYSHRL are analyzed under the same standard as claims under Title VII. *Kelly*, 716 F.3d at 14. As such, for the reasons set out above, Plaintiff states a claim for hostile work environment under the NYSHRL.

In contrast, claims under the NYCHRL are governed by a "more permissive" standard for liability. *Brown* v. *City of New York*, No. 11 Civ. 2915 (PAE), 2013 WL 3789091, at *18 (S.D.N.Y. July 19, 2013). The alleged conduct need not be "severe and pervasive"; rather, "the plaintiff need only demonstrate 'by a preponderance of the evidence that she has been treated less well than other employees because of her gender.'" *Mihalik*, 715 F.3d at 110 (quoting *Williams*, 872 N.Y.S.2d at 38); *see also Urquhart* v. *Metro. Transp. Auth.*, No. 07 Civ. 3561 (DAB), 2013 WL 5462280, at *11 (S.D.N.Y. Sept. 25, 2013) ("In determining whether a claim of hostile work environment survives summary judgment under the NYCHRL, the relevant consideration is whether there is a triable issue of fact as to whether the plaintiff has been treated less well than other employees because of his protected status." (internal quotation marks omitted)). Because Plaintiff meets the burden under the federal standard, it follows that she meets the lesser burden imposed under the NYCHRL.

To be sure, a stricter standard has been applied by courts considering the imputation of liability to an employer under the NYSHRL and the NYCHRL. *See, e.g.*, *Brown*, 2013 WL 3789091, at *18; *Int'l Healthcare Exch., Inc.* v. *Global Healthcare Exch., LLC*, 470 F. Supp. 2d 345, 361 (S.D.N.Y. 2007) (collecting cases). Under the NYSHRL, liability for an employee's discriminatory conduct may only be imputed to an employer if the employer "became a party to it by encouraging, condoning, or approving it." *Brown*, 2013 WL 3789091, at *18; *see also Forrest* v. *Jewish Guild for the Blind*, 3 N.Y.S.2d 295, 311 (2004) ("[A]n 'employer cannot be held liable under state law for an employee's discriminatory act unless the employer became a party to it by encouraging, condoning, or approving it.'" (quoting *Matter of State Div. of Human Rights* v. *St. Elizabeth's Hosp.*, 66 N.Y.2d 684, 687 (1985))). Employer liability under the NYCHRL for employee conduct, by contrast, may be imposed in three instances:

> (1) where the offending employee "exercised managerial or supervisory responsibility" … (2) where the employer knew of the offending employee's unlawful discriminatory conduct and acquiesced in it or failed to take "immediate and appropriate corrective action"; and (3) where the employer "should have known" of the offending employee's unlawful discriminatory conduct yet "failed to exercise reasonable diligence to prevent it."

*Zakrzewska* v. *New School*, 14 N.Y.3d 469, 479 (2010) (quoting N.Y.C. Admin. Code § 8-107(13)).

Defendant cannot, at the summary judgment stage, avoid imputation of liability under either the state or local human rights law. As for the NYCHRL, Okojie was Plaintiff's supervisor; even assuming he was not, for the purposes of

54

both statutes, it is not obvious from the record before the Court that Defendant took "immediate and appropriate corrective action" to respond to Plaintiff's claimed Title VII violations.  These are issues of fact better left for the jury to resolve.  For all of these reasons, Defendant's motion for summary judgment as to Plaintiff's claim for hostile work environment under Title VII, the NYSHRL, and the NYCHRL is denied.

**CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment is granted as to Plaintiff's claims under Title VII, the ADA, the NYSHRL, and the NYCHRL alleging retaliation and employment discrimination based on national origin and disability, and denied as to Plaintiff's hostile work environment claim under Title VII, the NYSHRL, and the NYCHRL.

The Clerk of Court is directed to terminate Docket Entry 28.

A pretrial conference will be held on January 15, 2014, at 3:45 p.m. to discuss scheduling trial in this matter.

SO ORDERED.

Dated:  December 2, 2013
        New York, New York

_____
    KATHERINE POLK FAILLA
    United States District Judge

*A copy of this was mailed by Chambers to*:

Kadie Sesay-Harrell
P.O. Box 109
Bronx, NY 10455

56